## State of Iowa v. W. J. Warner, Appellant.

**Manslaughter:** *JURY QUESTION.* It appeared that defendant took up some posts set by deceased for a division fence, on what deceased believed was the line between their farms, but which defendant claimed was not such line; that soon afterward, as defendant was driving his seeder over the line, and on that land claimed by deceased, the latter stopped it; that defendant went where deceased was; that, during a fight which ensued, defendant stabbed deceased with a pocketknife, killing him; that the trouble about the division line had existed about a year; that defendant had been acquitted of trespass, for which deceased had him arrested; that defendant was a much smaller and younger man than deceased; and that, as defendant knew, a few days before the fight, deceased put his shotgun in his wagon, and drove to the disputed line. There was evidence that, before such dispute arose, deceased carried a revolver, that he was quarrelsome, and in the habit of making threats of violence to others. Defendant knew his character. He testified that, after he was acquitted of trespass, he was told that deceased said that, if he could not keep him off his land by law, he would with a shotgun; that he stabbed him because of threats that deceased had made, and did not know but that he had a weapon of some kind in his pocket, and he supposed that he would be killed or seriously hurt if he did not defend himself; that he did not intend to kill deceased, and aimed to strike him

in the leg, somewhere; that, while he was getting out his knife, deceased was following him up; that he had his knife in his right hand, and was warding off the blows with his left; and that, if he had run, he might have got away. Deceased had no weapon. *Held*, that the evidence supported a verdict for manslaughter.

RULE AS TO SELF DEFENSE. The killing of an assailant is excusable on the ground of self defense, only, when it is, or reasonably appears to be, the only means of saving one's own life or preventing great bodily injury, and, if the danger can be avoided by retreat, or otherwise, the killing is not excusable.

*Appeal from O'Brien District Court.*—HON. SCOTT M. LADD, Judge.

FRIDAY, DECEMBER 11, 1896.

THE defendant was indicted for the crime of murder in the second degree. He was tried and convicted of manslaughter. From a judgment or sentence of imprisonment in the penitentiary, he appeals.— *Affirmed.*

*C. A. Babcock* and *W. D. Boies* for appellant.

*Milton Remley*, attorney general, for the state.

ROTHROCK, C. J.—It is conceded that on the second day of April, 1894, the defendant killed C. W. Inman, by stabbing him with a pocketknife in the lower part of the left side of his body. The defendant pleaded not guilty, and his defense was that his act was excusable upon the ground of self defense. In other words, he claimed that he was not guilty, under the familiar doctrine of the law that a person is excusable for taking the life of a person who attacks him, when the facts and circumstances attending the encounter are such as to lead an ordinarily cautious and prudent man to believe that the act he did was necessary to save his own life, or to protect his person from great bodily injury. The

defendant and deceased were owners of adjoining farms. There was a dispute between them as to the true location of the line between the two tracts of land. This contention had been existing for about a year. There was no partition fence between them until a few days before the tragedy, when the deceased set some posts, and stretched a barbed-wire on them, for some distance. The defendant took up and removed one or more of the posts, and, on the evening of the fatal encounter, he was engaged with a seeder and team in sowing oats on land along his boundary line. He crossed over the place where deceased claimed the line was, and, while driving and riding on his seeder, the deceased came from his house, and went in front of the team, and took hold of the bridle bits, and stopped the horses. The defendant left his seat on the seeder, and went to where the deceased was, and the parties engaged in a fight. The defendant claims that the deceased struck at him two or three times, and that he warded off the blows with one arm, and with his other hand he took his pocket-knife, and made the fatal stab. He testified that he did not intend to kill Inman. The conflict was of very short duration, and, while it was transpiring, the team ran away. When Inman was stabbed, he took a few steps, and laid down, and died within a few minutes afterwards. As we understand the evidence, it was ascertained by a survey of the land made after the tragedy, that the true line was where the defendant claimed that it was. But, so far as appears, the deceased believed that he was right about the boundary of his land. Inman was fifty-seven years of age, and of large size. The defendant was a much smaller and younger man.

Many witnesses were examined upon the question of the nature and disposition of the deceased. There is a very decided preponderance of the evidence to the

effect that he was a man of violent temper and over-bearing disposition, and in the habit of making threats of violence to others. A few days before he was killed, and when the dispute was pending, he put his shotgun in his wagon, and drove to the disputed line, where the defendant had taken up a post set by the deceased; and there is evidence that he at one time, before this contention about the boundary line, carried a revolver. In short, he was contentious, quarrelsome, abusive, and profane. The defendant knew that Inman had a gun in his wagon when he drove over to the disputed line, and, in his controversies with him, he had learned by observation and by information from others what the true character of Inman was. After the death of Inman, the defendant went to his own home. He made no attempt to escape, but surrendered himself, and submitted to an arrest without a warrant. He laid his pocket knife on the shelf, and said, "I never will carry a knife again." There were no witnesses near to the parties at the time of the collision between them, in front of the horses. Two or three saw the affray at a distance, but they could not describe it more particularly than to say it was a "scrap" or a fight. Both of the men were in a standing position until Inman went down, after he was stabbed. The defendant was a witness in his own behalf. He gave a history of the contention and trouble between him and Inman. Much of this had reference to stock passing over the unfenced line. It appears that Inman had moved on his farm the year before, and the defendant had raised crops, and cut hay, and stacked it on the land, having farmed it as a tenant. Inman had the defendant arrested for trespassing on the land by removing the hay, and refused to allow defendant's stock to pasture in the corn stalks. The defendant was tried before a justice of the peace, and was acquitted. The defendant

testified that after that trial was over, and on the same day, he was told that Inman threatened that, if he could not keep defendant off his land by law, he could keep him off with a shot gun, and he was then warned that Inman would kill him. The defendant, in his testimony, related the facts immediately attending the killing of Inman as follows: "I was driving down from the north end when I saw Inman coming up the road towards me, but I had no idea he intended any trouble. The first I knew about any trouble was that he stepped up, and grabbed my horses by the bits, and he said, 'Damn you, are you going to sow there?' And I told him to get away, and let my horses alone. He did not let go, and I got down off the seeder, and went around to where he was, to the head of the horses. He let go of the horses, and struck at me two or three times, and I pulled out my knife, and stuck it into him. The reason I stuck it into him was because the threats that he had made against me came into my mind, and I did not know but what he had something in his pocket, a weapon of some kind, and I supposed I would be killed, or I would be hurt seriously, if I did not defend myself; and, in sticking him with the knife, I did not intend to kill him, but I did it to protect myself, or to keep him from killing me, or from doing me great bodily harm. I aimed to strike him in the leg somewhere, and struck low on purpose. My intention was to keep him from making assaults on me. * * *" Further on in his testimony, he said "that, while I was getting out the knife, he was following me up, and was pretty close to me. I had the knife in my right hand, and was warding off his blows with my left. I do not think I struck at him before I drew out my knife, for he was firing his blows at me, and I was warding them off. * * * If I had run, I might have got away from him."

We have stated the leading facts, for the reason
that the only doubt we have in the case is whether
the evidence warranted the jury in finding the defend-
ant guilty of manslaughter.   After a careful examina-
tion of the whole of the evidence, our conclusion is
that it was a fair question for the jury to determine,
and that the district court did not err in overruling
the motion for a new trial, on this ground.   The fact
is that Inman had no knife, revolver, or other weapon
upon his person at the time.

II.   We have stated the rule applicable to the
law of self defense.   In the late case of *State v. Jones*,
89 Iowa, 183 (56 N. W. Rep. 427), it is said "that the
killing of an assailant is excusable on the
ground of self defense only, when it is, or rea-
sonably appears to be the only means of saving
one's own life, or preventing some great bodily injury.
If the danger which appears to be imminent can be
avoided in any other way, as by retiring from the con-
flict, the taking of the life of the assailant is not
excusable."   The instructions of the court upon this
branch of the case are assailed as erroneous.   We will
not set them out.   They are in accord with the rule
above announced, and with many other cases deter-
mined by this court.

III.   It is said that the indictment is fatally defect-
ive.   This position is not well taken.   It is not materi-
ally different from indictments which have been held
good for murder in the second degree, by this court.
This is so manifest that we will not set out the indict-
ment.

IV.   Other objections are urged, which demand
no special consideration.   The whole record shows
that the defendant was fairly tried.   The rulings of
the court all through the trial were liberal towards
the defense.   And the jury were evidently in sympathy
with the defendant.   Each one of the twelve jurymen

signed a request that, in fixing the sentence, the court should be merciful to the defendant. The judgment was that the imprisonment in the penitentiary should be for two years and three months. We discover no ground for interfering with the judgment, and it is AFFIRMED.