## STATE v. STUMBAUGH.

Under Pen. Code, §§ 242, 246, 254, declaring that a homicide is either murder, manslaughter, excusable homicide, or justifiable homicide, that homicide is "murder," when perpetrated with a premeditated design to effect the death of the person killed, and that homicide is "manslaughter," when perpetrated without a design to effect death, and in heat of passion, etc., and Code Cr. Proc. § 409, authorizing a conviction of any offense necessarily included in the offense charged, the jury may find accused guilty of manslaughter in the first degree under an indictment charging murder.

Where the shooting of decedent by accused was not denied, and he relied on self-defense, it was not error to charge that, if the jury were not satisfied that the killing was murder, or justifiable, or excusable, they could consider whether he was guilty of manslaughter.

Pen. Code, § 257, punishing manslaughter by imprisonment for not less than four years, confers on the court discretion to impose any reasonable term of imprisonment over four years which does not violate the Constitution, prohibiting cruel punishment; and an imprisonment for 12 years for the killing of decedent by shooting is not execessive.

The court need not in its instruction define excusable homicide, where there is no evidence to prove it.

To constitute "excusable homicide," under Pen. Code, § 266, declaring that a homicide is excusable when committed by accident and misfortune, in the heat of passion, on any sudden and sufficient provocation, or on a sudden combat, provided no undue advantage is taken, nor any dangerous weapon used, the killing must not only be committed by accident and misfortune, but no undue advantage must be taken, nor any dangerous weapon used.

Instructions that, if a conflict took place between decedent, armed with an ax, and accused, and there was a reasonable doubt whether decedent or accused was the aggressor, accused was entitled to the benefit of the doubt, that if accused had reasonable grounds to believe that decedent was trying to kill him or inflict great bodily injury on him, and that the danger was imminent, the killing was justifiable, and that, in determining whether accused was in imminent danger, the jury must determine that fact from accused's standpoint, acting as a reasonable man, etc., were sufficiently favorable to accused on the issue of self-defense.

Where accused relied on self-defense, and showed that some time before the killing decedent had struck him with a hammer, a charge that such evidence was only competent in determining who was the aggressor at the time of the difficulty, when the killing occurred, and that if decedent was the aggressor the jury might judge the circumstances surrounding accused as they appeared to him to be necessary for his proper self-defense, etc., was sufficient.

Evidence **held** to justify a conviction of manslaughter in the first degree, as against the claim of self-defense.

Under Pen. Code, § 268, declaring that homicide is justifiable when committed in the lawful defense of the person, when there is reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and. imminent danger of the design being accomplished, a lawful defense arises only when there is reasonable ground to apprehend a design to commit a felony or some great personal injury, and there is imminent danger of the design being accomplished; and one may not provoke an assault, in order that he may have an apparent excuse for a killing, and, where a killing may be avoided by the party assaulted with safety to his person, he must retreat.

The decision of the trial court, approving the verdict of guilty, should be given great weight on appeal in determining the sufficiency of the evidence.

The jury are the exclusive judges of the credibility of the witnesses and the weight of the evidence; and a verdict based on evidence justifying the conclusion reached cannot be disturbed on appeal.

The admission or rejection of photographs in evidence is largely within the discretion of the trial court, and, unless there has been a manifest abuse, the court on appeal will not reverse a decision thereon.

(Opinion filed October 3, 1911.)

Appeal from Circuit Court, Butte County. Hon. W. G. Rice, Judge.

Almer E. Stumbaugh was convicted of manslaughter in the first degree, and he appeals. Affirmed.

*A. J. Plowman,* for appellant. *Royal C. Johnson, Atty. Gen.,* and *A. B. York, State's Atty.,* for the state.

CORSON, J. Upon an information duly filed by the state's attorney of Butte county, the defendant was charged with the crime of murder in the killing of one Louis Arpan, on the 21st day of June, 1910. To this information the defendant pleaded not guilty, and upon the trial was found guilty by the jury of

manslaughter in the first degree, and sentenced by the court to 12 years' imprisonment in the state penitentiary. From this judgment, order denying a new trial, and order denying motion in arrest of judgment, the defendant has appealed to this court.

Numerous errors are assigned in the admission and rejection of evidence, alleged errors in the charge of the court, the refusal of the court to grant a new trial, and in denying defendant's motion in arrest of judgment.

It is disclosed by the evidence that the defendant and the deceased owned farms partially adjacent, on Indian creek, in Butte county, and that about a month prior to the day of the homicide they had had some difficulty over a line fence dividing their farms, resulting in the throwing of a hammer by the deceased at the defendant, hitting him in the back; that on the morning of the homicide the defendant started from his home on horseback, and that when starting out his attention was called by his wife to the fact that he had not taken his pistol, and that thereupon she handed him his pistol, and he placed it in his hip pocket; that the defendant, seeing the deceased at work at the fence, immediately went to the point where the deceased was working, and that an altercation occurred between them, resulting in the shooting of the deceased by the defendant, causing the two fatal wounds of which he died during the day. The shooting of the deceased by the defendant is not denied by him, but he claimed that the same was done in self-defense; that just prior to the shooting the deceased struck at him with an ax, over the fence; and that the defendant also fired two or more shots at him at about the time the shots were fired by him, resulting in the death of the deceased. There was evidence introduced tending to prove that the defendant fired five shots from his pistol, two of which, as before stated, took effect on the body of the deceased.

Four important questions are presented by the appellant's assignment of errors, viz.: (1) That the defendant having been charged in the information with the crime of murder, and the crime of manslaughter in either degree not having been alleged in the information, the court was not authorized in its charge to the

jury to state to them that, if they found the defendant not guilty of the crime of murder, they could find him guilty of the lesser crime of manslaughter in the first or second degree. (2) That the court could not under the law sentence the defendant upon the verdict of the jury in excess of four years' imprisonment in the state's prison, for the reason that the minimum penalty is four years, as fixed by the statute, for manslaughter in the first degree, and no maximum is fixed by the statute. (3) That the court erred in its charge to the jury. And (4) that the verdict of the jury is not supported by the evidence, and is against law.

It is contended by the appellant that, as the indictment charged the killing to be with premeditated design to effect the death of the deceased, and as the jury found that he was not guilty of the offense as charged, they were not authorized to find him guilty of manslaughter in the first degree, for the reason that the crime of manslaughter in the first or second degree is not included in the charge in the information. We are of opinion that this contention is untenable.

[1] Section 242 of the Penal Code provides: "Homicide is either: 1, Murder; 2, Manslaughter; 3, Excusable homicide; or, 4, Justifiable homicide." Section 246 provides: "Homicide is murder in the following cases: 1. When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being. * * *" And section 254 provides: "Homicide is manslaughter in the first degree in the following cases: * * * 2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."

It will be noticed that a homicide, to constitute murder, must be perpetrated "with a premeditated design to effect the death of the person killed, or of any other human being," except when perpetrated in the two cases provided for in subdivisions 2 and 3 of said section.

Section 409 of the Criminal Code provides as follows: "The

jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged in the indictment or information, or of an attempt to commit the offense."

At common law it was a general rule that when the indictment charged the offense of murder defendant, although acquitted of the higher offense, might be convicted of the lesser. Mr. Wharton, in his work on Criminal Law, § 542, says, "On an indictment for murder, the jury may find a verdict of manslaughter or of murder in the second degree," and cites a large number of authorities in support of the text.

In 22 Cyc. p. 466, the general rule is thus stated: "The general rule at common law was that when an indictment charged an offense which included within it another less offense or one of a lower degree defendant, although acquitted of the higher offense, might be convicted of the less." And on pages 469, 470, the author says: "Since an indictment for murder includes all the lower grades of felonious homicide, under a common-law form of indictment, a conviction may be had for either of the degrees of murder, as defined by statute, or of the lower grades of homicide. So upon an indictment charging murder generally a defendant may be found guilty of manslaughter, and, where manslaughter has been divided by statute into degrees, of any of the statutory degrees. It is also held that there may be a conviction for involuntary manslaughter, or negligent homicide. In case an indictment is drawn under a statute for murder in the first degree, a conviction may be had of a less degree or for manslaughter, since murder in the first degree, properly charged, includes every grade of homicide. So, where the indictment is for the second degree, a conviction of manslaughter may be had."

In the case of Keefe v. People, 40 N. Y. 348, the learned Court of Appeals of New York, in discussing a section of the New York statute quite similar, if not identical, with section 409 above quoted, speaking by Mr. Justice Grover, says: "I think the true construction of the statute is that, when the act for which the accused is indicted is the same act for which he is convicted,

the conviction of a lower degree is proper, although the indict-
ment contains averments constituting the offense of the highest
degree of the species of crime, and omits to state the particular
intent and circumstances characterizing a lower degree of the
same crime.   If this be the true construction, it follows that, un-
der an indictment for murder in the first degree, the accused may
be convicted of any degree of murder, or manslaughter, for the
unlawful killing of the identical person charged by the identical
means charged in the indictment.   This would not include a case
where the person killed was not the same as charged in the in-
dictment, nor where the means of effecting the death were ma-
terially variant from those the indictment charges."

In concluding the opinion, that court says: "We have seen
that the statute authorizing a conviction of a lower degree of the
same crime, upon an indictment for a higher degree, makes the
evidence authorizing such conviction competent.   Otherwise the
statute would be inoperative.   I the more readily adopt this con-
struction, as I cannot see that the accused can be prejudiced
thereby.   He is informed by the indictment of the particular crime
charged, and of the means used in its perpetration, and that it was
committed with the intent and under the circumstances constitut-
ing the highest degree of that crime.   He, therefore, comes to this
trial, not only prepared to show, if he can, that he is not guilty of
the particular degree charged, but of no lower degree of the same
crime.   If acquitted upon the indictment, or convicted in any
lower degree than that charged, he will find no obstacle in plead-
ing his acquittal or conviction in bar to any subsequent indict-
ment for the same crime."   Fitzgerrold v. People, 37 N. Y. 413.

In the late case of People v. Schleiman, 197 N. Y. 383, 90
N. E. 950, 27 L. R. A. (N. S.) 1075, 18 Am. & Eng. Ann. Cas.
588, decided by the New York Court of Appeals in 1910, the
learned Court of Appeals fully approved the law of the fore-
going decision, and in its opinion the court says: "Section 610 of
the Penal Law ([Consol. Laws 1909, C. 40] formerly Penal Code,
§ 35) provides as follows: 'Upon the trial of an indictment, the
prisoner may be convicted of the crime charged therein, or of a

lesser degree of the same crime, or of an attempt to commit the crime so charged, or of an attempt to commit a lesser degree of the same crime.' " The court proceeds: "Under this statutory provision, murder in the second degree is certainly a lesser degree of the crime charged in the indictment against the defendant. It has also been customary for trial judges to regard the various degrees of manslaughter as lesser degrees of the crime of felonious homicide; and therefore, upon the trial of indictments for murder in the first degree, it has been the usual practice for the trial judge, even without any request, and certainly when requested, to charge the jury that they might find the defendant guilty of murder in the second degree, or of manslaughter in any of its several degrees, or of an attempt to commit any of these crimes. * * * The definition of murder in the first degree in the Penal Code (now the Penal Law) of this state, when committed 'for a deliberate and premeditated design to effect the death of the person killed, or of another,' is broad enough to embrace murder in the second degree, as defined in the same statute, or manslaughter in either of its degrees. Hence, if the defendant had been tried for killing Mrs. Staber, with a deliberate and premeditated design to effect her death, the refusal of the trial judge to instruct the jury in reference to these lesser degrees of felonious homicide would unquestionably have been error."

By the Penal Code of New York (section 183), it is provided that homicide is either murder, manslaughter, excusable homicide, or justifiable homicide, and murder in the first degree is defined: "The killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when committed either, from a deliberate and premeditated design to effect the death of the person killed, or of another; or, by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any individual; or without a design to effect death by a person engaged in the commission of, or in the attempt to commit a felony, either upon or affecting the person killed or otherwise; or when perpetrated in committing the crime of arson in the first

degree." And murder in the second degree is defined as: "Such killing of a human being is murder in the second degree, when committed with a design to effect the death of the person killed, or of another, but without deliberation and premeditation." Section 184, P. C. And manslaughter in the first degree is defined as follows: " * * * When committed without a design to effect death, either (1) by a person engaged in committing, or attempting to commit, a misdemeanor, * * * or, (2) in the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon." Section 189, P. C.

It will thus be seen that by the Penal Code of New York murder and manslaughter are defined substantially as in the Code of this state, with the exception that the crime of murder in the New York Code is divided into the first and second degrees. We may properly add that the provisions of the Criminal Code of this state, above quoted, have been in force in the territory and state since 1865, and under these provisions many convictions have been had in this state of manslaughter in the first and second degrees, under indictments charging the offense of murder; and the propriety of instructions by the trial courts, calling the attention of the jury to the lesser offenses of manslaughter in the first and second degrees, has not, to our knowledge, been before questioned.

The jury, by their verdict, having found that the homicide in the case at bar was not perpetrated by the defendant with a deliberate design to effect the death of the deceased, was authorized to find that, though the homicide was not perpetrated with a premeditated design to effect the death of the deceased, yet that the life of the deceased was taken by the defendant by means stated in the indictment, to-wit, by shooting him with a pistol, and that the act was not excusable or justifiable, and the verdict was clearly authorized by the provisions of section 409, above quoted.

[2] The trial court was clearly justified, therefore, in calling the attention of the jury to the fact that, if they should find the defendant not guilty of the higher crime as charged in the indictment, that it was their duty then to consider the evidence with reference to manslaughter, and it was in fact its duty so to do.

In 21 Cyc. p. 1063, the learned author, on the subject of homicide, says: "Upon a trial for homicide, it is the duty of the court, when charging the jury, to state fully the law defining the crime for which the prisoner is being prosecuted, and every degree or grade of homicide of which he may be convicted under the indictment and evidence; and every element of such crime and of such degrees thereof should be clearly stated in language not calculated to confuse or mislead the jury"—citing a large number of authorities from the different states, supporting the statement of the author of the text.

The learned counsel, in discussing this branch of the case, relies on the case of Dedieu v. People, 22 N. Y. 178, but the Court of Appeals in the later case of Keefe v. People, 40 N. Y. 348, supra, quoted from, reviewed that case very fully, and drew the distinction between the law as laid down in that case, based upon the facts of that case, and the case then under consideration, and held that the former case had no application to cases of homicide, and was only applicable to a class of cases as particularly pointed out in that decision.

It is quite clear, therefore, in the case at bar, that the court committed no error in its charge to the jury, in which it stated to them, if they were not satisfied beyond a reasonable doubt that the killing was not under such circumstances as constituted murder, and was not under such circumstances as constituted justifiable or excusable homicide, it would be their duty to acquit him of the charge of murder, and consider whether or not he was guilty of manslaughter.

[3] This brings us to the second alleged error, viz.: That the trial court committed error in imposing a sentence in excess of four years upon the defendant, for the reason that the statute imposing a penalty for the crime of manslaughter provides as follows: "Every person guilty of manslaughter in the first degree is punishable by imprisonment in the state prison for not less than four years." Section 257, P. C. It is contended by the appellant that, as the minimum penalty is fixed at four years, but no maximum limit is fixed, the court was without jurisdiction to impose

any punishment in excess of the four years, and the learned counsel makes a very ingenious argument in support of this contention on the part of the appellant, but has cited no case in point supporting his contention. We are of the opinion that this contention of counsel is untenable, both upon principle and authority. It was competent for the Legislature to impose such penalty as it might deem proper, and leave it discretionary with the trial court as to the term of imprisonment the trial court might impose in excess of four years, in view of all the circumstances of each particular case. The Legislature, therefore, in limiting the trial court to four years as the minimum term, necessarily left it discretionary with the trial court to impose any reasonable term of imprisonment, not in violation of the constitutional provision which prohibits "cruel" punishment. And, in view of the evidence in the case at bar, this court cannot say that the term of 12 years, as designated by the trial court, constituted cruel punishment. Article 6, § 23, St. Const.; State v. Becker, 3 S. D. 29, 51 N. W. 1018.

In Jones v. Territory, 4 Okl. 45, 43 Pac. 1072, the Supreme Court of the territory of Oklahoma having under consideration a similar question, where the minimum punishment for manslaughter was fixed at four years, but no maximum prescribed by the statute, held, as appears by the sixth head-note, that: "An appellate court cannot say, as a matter of law, that a sentence to 50 years' imprisonment for manslaughter in the first degree is cruel and unusual punishment; the statute fixing the punishment at any period not less than four years." The court in its opinion says: "The ninth assignment is, 'The court erred in pronouncicng a cruel and unusual punishment,' and in support of this objection it is contended that a 50-year sentence amounts to a sentencec for life, and that therefore the punishment is cruel and unusual. The statute prescribing the punishment for manslaughter in the first degree (section 2089, St. Okl. 1893) fixes the punishment at imprisonment in the territorial prison for not less than four years. This leaves the maximum to be determined by the court, in the exercise of a sound discretion, having a regard to the character

of the crime, the age of the accused, and the circumstances under which the crime was committed. It is not unusual to fix the punishment at imprisonment for life for the killing of a human being. There is nothing in the record from which we can determine the age of the accused, his previous character, the circumstances under which the crime was committed, or his relations to the deceased; and we cannot say, as a matter of law, that a sentence of 50 years in the territorial prison for the crime of manslaughter in the first degree is per se cruel and inhuman. And while, under this statute, it is necessary for the court to fix the term of years for which one convicted of manslaughter in the first degree shall be imprisoned as a punishment for such crime, the Legislature has not seen fit to fix the maximum at any determinate period, but leaves the matter wholly in the discretion of the trial court, and it may be any period within the probable lifetime of the person convicted." In re Yell, 107 Mich. 228, 65 N. W. 97; State v. Teeters, 97 Iowa, 458, 66 N. W. 754; Freese v. State, 23 Fla. 267, 2 South. 1.

[4] It is contended by the appellant that the court erred in its charge to the jury in failing to define to them what constitutes excusable homicide; but, in our opinion, there is no merit in this contention, for the reason that there was no evidence in the case tending in any manner to prove excusable homicide, and the court is not required in its charge to call the attention of the jury to any defense which is not in any manner sustained by the evidence introduced on the trial. State v. Kapelino, 20 S. D. 591, 108 N. W. 335.

[5] Excusable homicide is defined by our Code as follows: "Homicide is excusable in the following cases: * * * 2. When committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat; provided, that no undue advantage is taken, nor any dangerous weapon used, and that the killing is not done in a cruel or unusual manner." Section 266, P. C. It will be noticed that to constitute excusable homicide the killing must not only be committed by accident and misfortune, but no undue advantage shall

be taken, nor any dangerous weapon used. In this case there was no evidence that the act was committed by accident and misfortune, and the act of killing was done admittedly with a dangerous weapon, to-wit, a pistol, loaded with gunpowder and leaden bullets.

[6] It is further contended by the appellant that the court erred in certain parts of its charge to the jury, but, after a careful examination of the charge and instructions of the court, we are of the opinion that it presented to the jury, very clearly and fully, all the questions necessary to be passed upon by them, and the law applicable thereto, in arriving at their verdict, and that the court committed no error in its charge. The learned circuit court gave to the jury all of the instructions requested by the defendant, prepared by his able counsel, except the third, in effect given in a modified form, which are as follows:

"(1) The court instructs you that if from the evidence in the case you believe that the defendant shot and killed the deceased, Louis Arpan, and that at the time of the shooting the deceased had an ax or other deadly weapon, and a conflict took place between the deceased and the defendant, and you have a reasonable doubt as to whether the deceased or the defendant was the aggressor—that is, the first to do an overt act towards the other—you should give the defendant the benefit of that doubt.

"(2) And if you have such a doubt as to whether the defendant or the deceased made the first overt act, then you should take into consideration the evidence of threats made by the deceased, if any, against the defendant, though they had not been communicated to the defendant before the shooting, for such evidence is competent to show that at the time of the shooting the deceased began the affray, thereby attempting to fulfill his threats."

"(4) If you find from the evidence that at the time the defendant shot the deceased the deceased was armed with an ax, and was striking or attempting to strike the defendant with it, and the defendant at the time had reasonable grounds to believe and did believe that the deceased was trying to kill him, or inflict

great bodily injury upon him, and that the danger of being killed or receiving great bodily harm was imminent, then the shooting of the deceased by the defendant was justifiable, and you should find the defendant was not guilty.

"(5) The court further instructs you that, in determining whether the defendant was in imminent danger of being killed or receiving great bodily injury by the deceased at the time he shot the deceased, you are to determine 'that fact from the standpoint of the defendant, acting as a reasonable man, in his position when he fired upon the deceased, and you should take into consideration the evidence whether or not the deceased had a loaded pistol upon his person at the time, and the danger, if any, the defendant would be placed in if he had attempted to turn and flee from the assault made by the deceased, if any was made by him.

"(6) The court further instructs you that, if you find from the evidence that the deceased made the first assault upon the defendant with an ax, and that the defendant had a right to be at the place where the shooting occurred, and was there for an honest purpose of dividing the fence, and that the defendant had reason to believe, and did believe, that he was in imminent danger of being killed by the deceased, or receiving great bodily harm, then the defendant was not required to retreat.

"(7) The court further instructs you that if you believe from the evidence offered by the state that at the time of the homicide the deceased was armed with an ax and a pistol, and that deceased first assaulted the defendant with an ax, in such manner as led the defendant to honestly believe he was in imminent danger of being killed, or suffering great bodily injury, and under such belief defendant shot the deceased, and the deceased continued the conflict by drawing a pistol and firing at the defendant, then I charge you that the evidence upon the part of the state tends to show that the defendant was justifiable, and the burden of proof remains upon the state to establish by the evidence, beyond a reasonable doubt, every element of the offense charged in the information, and if the state has failed to so establish every material element of the offense you should find the defendant not guilty."

It will be seen, therefore, from the instructions requested by
the defendant and given by the court, that they were as favorable
to the defendant as the law would permit.

[7] It is further contended by the appellant that the court
erred in refusing to give the third instruction requested by him,
which is as follows: "The court further instructs you that, if you
believe from the evidence that a short time before the shooting
the deceased threw and struck the defendant with a hammer, you
should take that evidence into consideration in ·determining who
began the affray; and it is also competent evidence as tending to
show that the defendant had reasonable grounds to believe that
he was in imminent danger of being killed, or receiving great
bodily harm at the time he shot the deceased, or if you believe
the deceased was making an assault upon the defendant with an
ax. Now, if one person assaults and strikes another with a
deadly weapon and a short time afterward again assaults such
person with another deadly weapon, the assaulted party would
have reasonable grounds to believe himself in imminent danger."
We are of the opinion that the court committed no error in re-
fusing to give this instruction as requested, as it omits several
necessary qualifications inserted by the court in modifying the in-
struction, which, modified, is as follows: "There has been some
evidence introduced in this case, * * * and it is contended by
the defendant, that some time shortly prior to the 21st of June,
the time of ·the homicide charged in this case, that the deceased,
Arpan, struck the defendant with a hammer. Now I charge
you * * * that the fact, if it be a fact, that the deceased struck
the defendant with a hammer at some time prior to the homicide
would not justify, of itself, the defendant in taking the life of
Louis Arpan, but that evidence would be competent for you to
consider in determining who in fact was the aggressor at the
time of the encounter charged in the information, and its character.
If you should determine that the deceased was the aggressor, then
its character, that you may judge the condition and circumstances
which surrounded the defendant at the time of firing the shot or
shots, or as it appeared to him at that time to be necessary so to

do in his own proper self-defense." The court further charged the jury upon that subject as follows: "If, after considering all the evidence in the case, the evidence satisfies you the defendant was surrounded by such conditions and circumstances, that he was assailed by the deceased in a manner that led him to believe that it was necessary for him to do the act which he did for his own protection, he would not be guilty; or if the evidence, although not satisfactory on that point, causes a doubt in your mind as to whether he was justified or not, that would be a reasonable doubt, and you should resolve it in his favor and acquit him."

[8] It is further contended by the appellant that the verdict of the jury was not justified by the evidence or the law applicable to the case; but we are of the opinion that there was sufficient evidence to warrant the jury in finding that the defendant was not justified in taking the life of the deceased. The evidence in the case is very voluminous, and any attempt to set it out in detail would extend this opinion to an unreasonable length. It may be stated, however, that it was shown by the admission of the defendant that he was upon property owned by Lydle, and not upon his own premises, at the time of the shooting, and the deceased was upon the other side of the fence on his own premises; that at the time the deceased struck at the defendant, as testified to by the defendant, the defendant made no effort to retreat or avoid the difficulty, but immediately drew his pistol and fired the five charges therein, two of which struck the deceased; one taking effect in the jaw and the other in the back of the deceased. No person was present at the place of the shooting, except the deceased and the defendant. Two witnesses, however, at some little distance from the place, testified that they heard four or five shots in quick succession, and then two shots after an interval of time. The defendant testified that the deceased drew his pistol at about the time he drew his, and that they exchanged shots simultaneously. Deceased, however, in his dying statement, states the circumstances as follows: "I went to the field about 7 o'clock, and after being there about 20 minutes Almer Stumbaugh came to where I was, and got off his horse and began to quarrel. He

claimed half the fence, and said he was going to take it; said he would show me something, and drew his gun and shot me, the first time in the jaw, which knocked me down, and then he shot me in the back. I turned over, and drew my gun out of my shirt, and shot twice at him. When I went to the field this morning I expected trouble, as Almer Stumbaugh had told Harry Dubuque and Roy McGraw about two weeks ago that he was going to kill me." The dying statement was corroborated by the physicians, who made an autopsy on the deceased after his death, as to the fact that he was shot in the jaw and also in the back.

It is also disclosed by the evidence that a short time subsequently to the shooting the defendant sent word to the state's attorney and the deputy sheriff, advising them of the fact that the deceased, Arpan, had been shot, and requested them to come out and investigate the matter, and they immediately proceeded to the home of Stumbaugh, arriving there about noon; that after dinner they accompanied Stumbaugh to the place of the shooting, and examined the ground and the point near the fence where he said he was standing at the time of the shooting, and at about 12 feet from the fence, on the deceased's side of the same, they found a pool of blood and an ax; that the country was open prairie, extending from the side of the fence where Stumbaugh was standing at the time of the shooting for a considerable distance.

Edwin Ronning, a witness for the defendant, testified that he lived about one-half mile from the defendant's house; and he says: "I heard pistol or gunshot reports that day, about 7:10 in the morning. I heard four, and then I heard two more—six altogether."

James Jordon, a witness on behalf of the state, testified: "I heard two reports in succession, and shortly afterwards I heard three more, it seemed to me, and before another one, an interval between them, and then another. Altogether there seemed to be seven shots. After I heard the first two shots I kind of resumed my work, and when I heard the other shots I thought there must be something the matter, and I kind of looked that way, and ran

up towards Stumbaugh's house. At Stumbaugh's place, when I reached there, I found Mr. and Mrs. Stumbaugh. * * * When I reached the house Mr. Stumbaugh was the first one I spoke to. I asked him what was the matter. Q. What did he say? A. All I understood was, 'Cutting my fence.' I said, 'Who?' Q. What did he say? A. He replied, 'Lou.' Shortly after that he said, 'I think I fixed him.' That conversation occurred outside the house."

The defendant, in describing his pistol, says: "It is a double-action pistol. It goes off by pulling your finger." The state's attorney, Mr. Raish, in his testimony, in giving a conversation that he had with the defendant at the time he was at his house, testified: "He [referring to the defendant] said that he had emptied his gun and was out of cartridges, and went to the house to get his Winchester." Mr. Stumbaugh· (in answer to the question on cross-examination): "Q. How many cartridges were in this pistol when you went down there? A. It was full. Q. How many were there when you went back? A. I cannot tell; I threw them out. Q. How many were in it when you went down? A. Five, I said. They were all loaded when I went down."

There was evidence that each party had made threats against the other, and the evidence discloses the fact that there was a very bitter feeling between them. It is disclosed by the evidence that prior to the shooting there had been some difficulty between Stumbaugh and Arpan in regard to the fence. And it was claimed by Stumbaugh that about a month previously Arpan had thrown a hammer at him, hitting him in the back, and that he made complaint to the state's attorney in relation thereto. It is also disclosed by the evidence that in the fall of 1909 Stumbaugh made complaint to the state's attorney that Arpan had cut his fence, but no formal complaint was made by the state's attorney against Arpan, and no legal proceedings resulted therefrom.

[9] By section 268 of the Penal Code, it is provided that: "Homicide is also justifiable when committed by any person in either of the following cases: 1. When resisting any attempt to murder such person, or to commit any felony upon him or her, or

in any dwelling house in which such person is; or, 2. When committed in the lawful defense of such person,,    *    *    *    when there is reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished.    *    *    * "

It will be noticed that the lawful defense arises only when there is reasonable ground to apprehend a design to commit a felony or do some great personal injury, and imminent danger of such design being accomplished. While it is true that life may be taken in the reasonable and lawful exercise of the right of self-defense, this right must be exercised honestly; and a party cannot provoke an assault, in order that he may have an apparent excuse for the killing; and, if the killing of his assailant can be avoided by the assaulted party with safety to his person, it is his duty to retreat and avoid such killing of his assailant. It evidently was the theory of the prosecution in this case that the defendant went to the place of the difficulty with the intention of provoking a quarrel with the deceased and taking his life; and there was evidence in the case leading to sustain that theory. On the other hand, it was the theory of the defense that the defendant was assaulted by the deceased by the lunge at him with the ax, and that he thereupon had the right to kill the deceased in self-defense. But it has long been settled law that, if a person assaulted can avoid the killing by reasonable efforts, it is his duty to do so. Although an assault might have been made upon the defendant by the deceased with the ax, while standing on the opposite side of the fence, as testified to by the defendant if he could have then withdrawn with safety from the place of danger without further risking his own life, or being in danger, actual or apparent of great bodily injury, he should have so withdrawn. The law, as stated in the old law books, is that the person assaulted must retreat to the wall or ditch, meaning, of course, he must go as far as he can with safety, before he would be justified in taking the life of his assailant. Assuming, therefore, that the defendant was assaulted, as alleged by him, still he would not be justified in taking the life of the deceased, so long

as he could have retreated safely from the scene without actual or apparent imminent danger to his own life,. or of great bodily injury.

In State v. Jones, 89 Iowa, 182, 56 N. W. 427, it was held by the learned Supreme Court of Iowa, as appears by the headnote, as follows: "The killing of an assailant is excussable on the ground of self-defense only when it is, or reasonably appears to be, the only means of avoiding danger, and if it can be avoided by retreat the killing is not justified." The court, in its opinion, says: "It may be conceded that in the earlier adjudications of this court there is language employed which may be said to lay down the doctrine that one who is assaulted with a deadly weapon is not required to flee from his adversary, but may strike and kill in his own defense. See Tweedy v. State, 5 Iowa, 433. But in the later utterances of this court, and it may now be said to be the general rule elsewhere, the killing of an assailant is excusable, on the ground of self-defense, only when it is, or reasonably appears to be, the only means of saving his own life, or preventing some great bodily injury. If the danger which appears to be imminent can be avoided in any other way, as by retiring from the conflict, the taking of the life of the assailant is not excusable" —citing a large number of Iowa cases. In the later case of State v. Warner, 100 Iowa, 260, 69 N. W. 546, that court fully approved the foregoing decision, repeating the same headnote.

In Barnett v. State, 100 Ind. 171, the learned Supreme Court of Indiana held, as appears by the headnote, that: "Life may be taken in the the reasonable and lawful exercise of the right of self-defense. This right must be exercised honestly; a party cannot provoke an assault, in order that he may have an apparent excuse for the killing."

In the case at bar, the killing of the deceased by the defendant being conceded by him, and the jury having found that the shooting on the part of the defendant was not with a premediated design to effect the death of the deceased, the only other question for them to determine apparently was whether or not the appellant was justified in shooting the deceased, and they, by their

verdict, evidently arrived at the conclusion, after considering all the evidence, that the defendant was not so justified. They may have taken the view that, assuming that the deceased made the assault, testified to the defendant, with the ax, still the defendant could have easily avoided further danger by withdrawing from the scene, and thereby ending the difficulty between him and the deceased. The defendant admits that he made no attempt to retreat, and the evidence quite clearly shows that the statement made by the deceased that the defendant immediately drew his pistol and commenced firing at him, after the alleged assault by the deceased, was in fact true, as it is quite apparent from the place where the pool of blood and ax were found—some 12 feet distant from the fence—that the deceased had retreated, and was in the act of going away, before the shots were fired by the defendant; and this theory is strongly corroborated by the fact that the deceased was shot in the back, and at a point quite distant from the fence. It is quite clear, therefore, that the evidence was such as to warrant the jury in believing that there was no such actual or apparent danger to the defendant, or danger of great personal injury, as authorized him to take the life of the deceased, and that he could have avoided the killing by withdrawing from the scene without danger to himself, either actual or apparent. After a careful review of the evidence, we are satisfied that the verdict of the jury was fully warranted by the same.

[10] The fact that the trial judge, after hearing the evidence and observing the demeanor of the witnesses in giving their testimony, refused to grant defendant a new trial, and imposed a sentence largely in excess of the minimum penalty imposed, in cases of manslaughter in the first degree, by the statute, indicates that he was fully satisfied with the verdict; and his decision necessarily should have great weight with this court, as the trial judge had the opportunity of seeing and hearing the witnesses, and especially of observing the demeanor and manner in which the defendant gave his testimony.

[11] From the evidence in this case, the jury might have reasonably drawn the inference that the defendant was not even

in apparent danger of being killed or seriously injured by the deceased, and that he might have reasonably withdrawn from the scene and avoided killing the deceased, had he chosen to do so; and it is quite evident from the verdict of the jury that such conclusion was reached by them, and the jury being the exclusive judges of the credibility of the witnesses and the weight of the evidence their verdict, based upon evidence which would justify such conclusion, cannot be disturbed by this court.

[12] It is further contended by the appellant that the court erred in admitting a certain photograph, made some little time after the tragedy, showing the location of the parties at the time of the shooting, as pointed out by the defendant, on the ground that there had been some change made subsequently to the shooting and before the photograph was taken. But it is disclosed by the evidence that the change made was so slight as to not materially affect the value of the photograph as indicating the position of the parties, the location of the fence, and the topography of the ground. The admission or rejection of photographs in evidence is largely within the discretion of the trial court, and, unless there has been a manifest abuse of such discretion, this court will not reverse the decision of the trial court in admitting or rejecting the same. See Whaley et al. v. Vidal et al., 27 S. D. 132 N. W. 248, and cases cited.

We have not overlooked the other errors assigned, but in our view they do not have sufficient merit to jusitfy a separate consideration in this opinion.

Finding no error in the record, the judgment of the court below and order denying a new trial are affirmed.