STATE of South Dakota, Plaintiff
and Appellee,

v.

Burton LOHNES, Defendant
and Appellant.

No. 13572.

Supreme Court of South Dakota.

Argued April 28, 1982.

Decided Sept. 15, 1982.

Rehearing Denied Oct. 26, 1982.

Douglas E. Kludt, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

John J. Burnett, Public Defender's Office, Rapid City, for defendant and appellant.

MORGAN, Justice.

Burton Lohnes (appellant), was sixteen years old when Harry Mantzoros (Mantzoros) was shot and killed with a rifle, which was later found in a vehicle stolen by appel-

lant. Appellant was first arrested for theft and burglary. Later, after further interrogation, he was also arrested for first-degree murder in the shooting death of Mantzoros. Appellant was tried as an adult on the charges of third-degree burglary, grand theft and first-degree murder. A jury convicted appellant of the burglary and grand theft charges and second-degree murder. Appellant appeals the murder conviction and we reverse and remand.

On November 13, 1980, the First Stop Gun Shop in Rapid City, South Dakota, was burglarized and several guns stolen. That same night, a 1979 Dodge pickup was reported stolen. At 10:45 p. m., the Highway Patrol informed the Rapid City Police Department that they were following a 1979 Dodge pickup. Rapid City Police Officer Jones (Officer Jones), upon hearing the report, proceeded to the vicinity to aid in identifying the pickup. While enroute, he received a radio transmission that the driver had abandoned the vehicle and was on foot. On his way to the scene, Officer Jones spotted appellant running and ordered him to stop. Appellant immediately stopped, and threw a rifle and athletic bag to the ground. Officer Jones, with the aid of another officer, handcuffed appellant and transported him to the Rapid City Police Station.

At the station, Officer Jones turned appellant over to Detective Hedenskog who began interrogation at 11:25 p. m. and continued into the early morning hours of November 14, 1980. Appellant appeared nervous and scared but coherent and not intoxicated. Shortly after the questioning began, Detective Hedenskog discovered that appellant was a juvenile. Without attempting to contact a parent or guardian, the questioning continued. Detective Hedenskog read appellant his *Miranda* rights but did not ask him if he wished to waive these rights. During this initial interrogation, appellant admitted burglarizing the First Stop Gun Shop and stealing the 1979 Dodge pickup. Appellant further admitted that he was an escapee from the State Training School in Plankinton and that he had been drinking all that day.

After Detective Hedenskog completed his questioning, appellant was taken to the hospital by Officer Jones to receive medical attention for a cut on his knee. Between 5:15 and 5:30 a. m., Jones transported appellant to the juvenile detention center. Approximately three hours later, appellant was again taken to the Rapid City Police Station. By this time, the police had begun investigating the shooting death of Mantzoros. Rapid City Detective Scherr, assigned to this investigation, considered appellant a suspect as early as 9 a. m. on November 14th.

Mantzoros operated the Ranch House Motel in Rapid City. Donald Lane, an uncle of appellant, stayed at the motel on November 13. Appellant went to the Ranch House Motel where a fight erupted between himself and Lane. Lane ran into the motel manager's office then occupied by Mantzoros. According to Mantzoros' son, his father called him about the altercation. Sometime later appellant again encountered Mantzoros in the motel office. This time, according to appellant, Mantzoros appeared to have a pistol. Appellant became enraged, chasing Mantzoros to a back room with a .243 rifle where he shot him. At 7:30 a. m., the son returned to the motel to find his father's corpse in the motel office. The investigation indicated that Mantzoros had been shot with a .243 Remington rifle, stolen earlier in November. The rifle was found on the floorboards of the 1979 Dodge pickup admittedly stolen by appellant. Mantzoros' driver's license was also found in the pickup.

Between 8:30 a. m. and 11:30 a. m. on November 14th, the police attempted to locate a guardian for appellant so that they could again interrogate him, this time concerning the murder. They contacted Willard Foley (Foley), Chief Court Services Officer for the Seventh Judicial Circuit. Subsequently, via a news report, Foley learned that appellant was a suspect in Mantzoros' death and might be tried as an adult. Foley immediately arranged for a juvenile detention hearing before Judge Grosshans for

12:15 p. m. As soon as the police department became aware of this scheduled hearing, Rapid City Police Captain Hennies called Foley and requested a delay because they wanted to interrogate appellant. Foley refused because he felt it was improper. Captain Hennies, however, said he would get a continuance by other means. Captain Hennies also informed Foley that they contemplated using a parole officer, Scott Schuft, as appellant's guardian. Foley again objected to this as improper.

Captain Hennies called the state's attorney's office. A meeting was subsequently held in Captain Hennies' office with William Tschetter, acting state's attorney, John Seehan, assistant state's attorney, Captain Hennies, Deputy John Moore, the sheriff's representative in the investigation, Detective Scherr, and Scott Schuft. Each of the police officers felt that they had enough evidence at this time to arrest appellant for the murder of Mantzoros. Additionally, each and every person at this meeting knew that unless the 12:15 p. m. detention hearing was continued, appellant would have counsel appointed and would refuse to admit to the murder. With the aid and advice of the state's attorney's office, Scott Schuft became appellant's acting guardian and the continuance was obtained from Judge Grosshans until 4:00 p. m. that day. At no time prior to 4:00 p. m. was Judge Grosshans told that the delay was sought because the police intended to seek an admission from appellant on the murder charge. Foley was not informed of the delay but discovered it when he appeared at the court chambers at 12:15 p. m. Foley immediately sought the advice of several other judges, but, despite their advice, did not contact Judge Grosshans.

Without informing appellant that he was the prime suspect in a murder, Detective Scherr, in the presence of Scott Schuft, began interrogating him at approximately noon. Detective Scherr meticulously informed appellant of his rights, but again did not ask appellant if he wished to waive those rights. By his own admission, Schuft had satisfied his duty as guardian after the rights were read and he believed appellant

understood them. Although he remained throughout the interrogation and knew that an attorney was better suited to advise appellant, Schuft never said a word. Indeed, Schuft recognized no distinction between the roles of the police officers and his own role as guardian. Sometime after 12:15 p. m., the time originally scheduled for appellant's detention hearing, Detective Scherr obtained the sought-after admissions.

Later that afternoon, November 14, 1980, the rescheduled detention hearing was held and an attorney was appointed to represent appellant. In January, 1981, Judge Grosshans of the Seventh Judicial Circuit held a transfer hearing in which he ordered that appellant would be tried as an adult. Appellant, then, was arraigned in circuit court. That same month appellant moved to suppress the statements which he had made during the interrogation on November 14th. At a suppression hearing held in February, 1981, the various officers candidly admitted their participation in delaying appellant's detention hearing and their motive to obtain a confession before counsel was appointed for appellant. Appellant received a psychiatric examination in Rapid City during February, 1981, and again in Sioux Falls during July, 1981. In August, 1981, appellant's motion to suppress statements made during interrogation was denied and appellant was tried for third-degree burglary, grand theft, and first-degree murder. A jury found appellant guilty of third-degree burglary, grand theft and second-degree murder. Appellant appeals from the murder conviction, alleging that the trial court erred in instructing the jury that second-degree murder was a lesser included offense. Further, appellant alleges that the trial court should have suppressed the November 14th confession since the State deliberately acted to delay the detention hearing in order to deprive him of an attorney.

We first consider the propriety of the trial court's instruction on second-degree murder. Count 3 of the information charged appellant with first-degree murder in the following manner:

That on or about the 13th day of November, 1980, in the County of Pennington, State of South Dakota, Bert Lohnes did commit the public offense of First Degree Murder in that he did then and there, feloniously, without authority of law and with premeditated design to effect the death of Harry Mantzoros, a human being, did kill and murder said Harry Mantzoros by gunshot, in violation of SDCL 22–16–4, and contrary to statute in such case made and provided against the peace and dignity of the State of South Dakota.

Over appellant's objection, the trial court instructed the jury on the offense of second-degree murder as well as on the offense of first-degree murder. The jury verdict convicted appellant of the offense of second-degree murder, an offense that he was never charged with and which has distinctly different elements than first-degree murder.

In *State v. Reddington,* 7 S.D. 368, 64 N.W. 170 (1895), this court held that it was reversible error to charge a defendant with murder with a premeditated design under one penal provision and instruct the jury under another penal provision. The jury instruction in *Reddington* provided that they could convict if satisfied that the death of the deceased was caused by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, without any premeditated design to effect the death of the person killed.

The State argues that *Reddington* is ancient and not to be relied upon because the homicide statutes have changed. In 1895, there was only one degree of murder, although defined in three different ways; each made the defendant liable for the same potential maximum punishment. Today, murder with premeditated design is designated first degree, SDCL 22–16–4, and murder perpetrated by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, but without any premeditated design to effect the death of the person killed is designated second degree. SDCL 22–16–7. These homicide statutes have dissimilar penalties.

Furthermore, the State urges SDCL 23A–26–7 mandates that, in cases of a crime designated by degrees, the jury shall find the degree of the crime and include that in its verdict. SDCL 23A–26–7 provides:

Whenever a crime is distinguished by degrees, a jury, if it convicts an accused, shall find the degree of the crime of which he is guilty and include that finding in its verdict. When there is a reasonable ground of doubt as to which of two or more degrees an accused is guilty, he can be convicted of only the lowest degree.

This court has approved the application of this statute relating the charge of manslaughter to that of murder charged in the information, or a lesser degree of manslaughter when first-degree manslaughter was so charged. We hold, however, that the State's argument is misplaced in this context because the use of first and second degree by the legislature had no effect on the elements of the first and second-degree murder charge.

While *Reddington* may be hoary with age it nevertheless contains reasoning that sounds of a constitutional dimension, which knows no aging until the constitution is amended. The court stated: "One purpose of an indictment is to apprise the defendant of what he is charged with having done that constitutes a criminal offense, so that he may be prepared to defend himself at the trial." 7 S.D. at 379, 64 N.W. at 173. Article VI, § 7 of the South Dakota Constitution provides, in pertinent part: "In all criminal prosecutions the accused shall have the right ... to demand the nature and cause of the accusation against him; to have a copy thereof ...."

In regard to these provisions, this court has said: "The principal office of the indictment is to inform the accused of the 'nature and cause of the accusation against him'; to be thus informed being one of [the accused's] most important constitutional rights." *State ex rel. Kotilinic v. Swenson,* 18 S.D. 196, 202, 99 N.W. 1114, 1115 (1904). As the court pointed out in *Reddington,* and as is equally true in this case before us,

[t]he indictment charged a murderer of a specific class, and set forth the distinctive legal characteristics of such a murder, and that was the crime, and the kind of a crime, for which he was being tried. A plea of not guilty put only the allegations of the indictment in issue, and such allegations charged killing with express malice towards the deceased, and with a premeditated design to effect his death; and in our judgment it was error to charge the jury that, in order to convict, it was not necessary for the state to make out such a case as it had set out in the indictment.

7 S.D. at 380–81, 64 N.W. at 174.

We, therefore, hold that the trial court was clearly in error in instructing the jury on the offense of second-degree murder.

Because a retrial is mandated, we deem it necessary to consider appellant's argument that the trial court erred in failing to suppress his confession for two reasons: (1) That the State had deliberately delayed appellant's appearance before a judge in order to deprive him of an attorney until they had extracted a confession; and (2) that the confession was not voluntary, considering the totality of the circumstances. We have previously detailed the activities of the police and state's attorney's office in delaying appellant's appearance before the judge, and noted that at the suppression hearing the officers candidly admitted that they had so acted.

Actually, the two grounds are intermingled, because intentional delay of the appearance of a juvenile before a judge would obviously figure strongly in the totality of the circumstances. Although the findings of fact and conclusions of law of the trial court in the suppression hearing go into great detail as to the circumstances, nowhere do we find any mention of the intentional delay. Further, we do not find either proposed findings and conclusions by appellant's counsel, or objections to the State's proposals. Absent the issue of an intentional delay, we would have to affirm the trial court's actions inasmuch as such findings as the trial court does make are not contra-

dicted by a clear preponderance of the evidence. *See McMullen v. State,* 84 S.D. 538, 173 N.W.2d 499 (1970).

Although appellant's counsel has not preserved the error for appeal, under our rule which requires proposed findings and conclusions, and objections, *Jennings v. Jennings,* 309 N.W.2d 809 (S.D.1981), we have determined that such a substantial right is involved as to mandate review under the plain error rule, SDCL 23A–44–15. *See State v. Brammer,* 304 N.W.2d 111 (S.D. 1981). We therefore consider whether appellant's confession was properly admitted since the suppression hearing transcript demonstrates that the officials had intentionally delayed his detention hearing in a successful effort to deprive him of counsel in order to obtain inculpatory admissions.

Appellant cites us to our recent holding in *State v. Poss,* 298 N.W.2d 80 (S.D.1980), wherein representatives of the same agencies in Rapid City had intentionally delayed an arraignment of an adult in an effort to obtain inculpatory evidence. In that case, we discussed application of SDCL 23A–4–1, which provides, in pertinent part: "A law enforcement officer making an arrest shall, without unnecessary delay, take the arrested person before the nearest available committing magistrate." In *Poss,* appellant sought dismissal because of the delay of some sixty-five hours. The trial court denied the motion for dismissal but suppressed the confession. We noted in particular that "[i]llegal detention is not a grounds for dismissal absent a showing of prejudice to the [appellant]. Further, illegal detention is a nonconstitutional and nonjurisdictional defect." *Id.* at 85 (citations omitted). Most important for our discussion here, are the statements in *Poss* that:

The States Attorney's actions were diametrically opposed to the purpose and meaning of SDCL 23A–4–1. * * *

Although the trial court's order of suppression foreclosed prejudice from occurring as to the appellant's position at trial,

we condemn the pre-arraignment tactics of the States Attorney in this case. Calculated delay in a defendant's right to be taken before a judicial officer cannot be justified by self-ordained zeal and has no place in this state's system of criminal justice.

*Id.*

In this case, the relief sought by appellant was the suppression, not dismissal, of a confession and a fair reading of *Poss* would seem to mandate it. The State, however, argues that *Poss* is inapplicable, as is SDCL 23A–4–1, because appellant herein was a juvenile, detained under juvenile procedures in SDCL ch. 26–8, and that more particularly, under the provisions of SDCL 26–8–23.1, a juvenile can be held up to forty-eight hours without a hearing. This argument is unsound, misplaced and indeed alarming.

Admittedly, SDCL 23A–4–1,[1] addressing arrest procedures, speaks of "unnecessary delay" whereas SDCL 26–8–23.1,[2] addressing juvenile detention, speaks in terms of "prompt hearing" within a maximum of forty-eight hours. We hold that this is a distinction without a difference, particularly since the latter statute is drawn in the context of the *parens patriae* theory of the juvenile treatment which promotes a close relationship between a juvenile and the representatives of the court.

■ Juvenile proceedings and sentences, with the exception of transfer hearings, are conducted solely in the best interests of the child. SDCL 26–7–11; *People in Interest of D. M. L.,* 254 N.W.2d 457 (S.D.1977); *People in Interest of L. V. A.,* 248 N.W.2d

864 (S.D.1976). Moreover, the treatment of a juvenile is informal, protective, rehabilitative and nonadversarial, as opposed to the formal, adversarial, retributive treatment used to secure criminal sanctions against persons tried as adults. *State v. Gullings,* 244 Or. 173, 416 P.2d 311 (1966).

■ The United States Supreme Court has repeatedly required that juvenile proceedings satisfy due process rights.[3] As the Court stated in *Gault,* "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone." 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527, 538. With few exceptions, courts require additional protection of a juvenile's constitutional right to counsel and against self-incrimination. *State v. Loyd,* 297 Minn. 442, 212 N.W.2d 671 (1973); *State v. Cano,* 103 Ariz. 37, 436 P.2d 586 (1968). Before a juvenile, who will' be tried as an adult, effectively waives his constitutional right to counsel and against self-incrimination, the juvenile must be given notice that he may be tried as an adult. *State v. Loyd, supra; State v. Cano, supra; Theriault v. State,* 66 Wis.2d 33, 223 N.W.2d 850 (1974).

■■ Clearly, in this case, the police and state's attorney had decided before the interrogation to request that appellant be tried as an adult. Moreover, he was in fact tried as an adult. We now hold that a juvenile is afforded additional, not less, protection of his constitutional rights and before a trial court can conclude that a juvenile has made a clear and intelligent waiver of his rights to counsel and against self-incrimination, the state shall have to establish

---

1. SDCL 23A–4–1 provides in pertinent part: "A law enforcement officer making an arrest shall, without *unnecessary delay,* take the arrested person before the nearest available committing magistrate." (emphasis added).

2. SDCL 26–8–23.1 provides in pertinent part:
When a child is placed in a facility designated by the court, the person in charge of the facility shall *promptly* so notify the state's attorney.
No child shall be held in detention . . . longer than *forty-eight hours* . . . unless a petition has been filed, or the court so orders following a

hearing to determine further detention or release. (emphasis added).

3. *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Application of Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Kent v. United States,* 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966); *Gallegos v. State of Colorado,* 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); *Haley v. State of Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948).

that he was advised that there was a possibility that he may be tried as an adult.[4]

■ From our review of the record, it is clear that appellant was never advised that his statements could be used against him in an adult proceeding. We therefore hold that upon retrial such statements should be suppressed.

We reverse and remand for new trial.

HENDERSON, J., concurs.

FOSHEIM, C. J., and WOLLMAN and DUNN, JJ., concur in part and dissent in part.

FOSHEIM, Chief Justice (concurring in part, dissenting in part).

I dissent from that part of the majority which holds that the trial court erred in instructing the jury on second-degree murder.

In *State v. Stumbaugh,* 28 S.D. 50, 132 N.W. 666 (1911), the defendant was indicted for murder and convicted of manslaughter in the first degree. The first error urged by appellant was:

[T]he defendant having been charged in the information with the crime of murder, and the crime of manslaughter in either degree not having been alleged in the information, the court was not authorized in its charge to the jury to state to them that, if they found the defendant not guilty of the crime of murder, they could find him guilty of the lesser crime of manslaughter in the first or second degree.

*Id.* at 688. In *Stumbaugh* we held that the trial court correctly instructed on manslaughter, stating that any other view was "untenable." The court went on to say that a defendant is held to notice that an indictment for murder "includes all the lower grades of felonious homicide" and that in homicide cases it is the *duty* of the trial court to instruct the jury that if they find the defendant innocent of the crime charged they must consider the evidence relative to the other forms of homicide.

*State v. Hubbard,* 20 S.D. 148, 104 N.W. 1120 (1905), presented an inverse situation: the defendant was charged with murder, the trial court instructed on first-degree manslaughter but refused to instruct on second-degree manslaughter. We held that pursuant to statute (currently SDCL 23A–26–7) "... it is indispensable to the proper trial of a homicide case that the degree of the crime be ascertained and designated by the jury. The record must show this *essential element* of the verdict, in order to enable the court to pronounce judgment within the penalty attached in a crime of that degree." *Id.* at 1121 (emphasis added). We held that upon trial for murder, even though the trial court believes the evidence only warrants conviction of the higher offense, all degrees of criminal homicide must be submitted to the jury. *Hubbard* emphasized that a conviction for second-degree manslaughter is *legally responsive to a murder indictment,* even though such verdict "might be illogical, unjust or unjustifiable under the evidence." *Id.*

In 1980, murder was designated by our legislature as murder in the first or second degree. First-degree murder carries a Class A felony penalty. The lesser Class B felony penalty applies to second-degree murder. SDCL 22–16–12.[1] SDCL 23A–

4. *In Matter of M. J. B.,* 284 N.W.2d 874 (S.D. 1979) and *Matter of V. R.,* 267 N.W.2d 832 (S.D.1978), this court examined juveniles' waiver of their right to counsel and privilege against self-incrimination. In those cases, we held that the juveniles' statements were admissible. The present case, however, is distinguished because the juveniles in *Matter of M. J. B.* and *Matter of V. R.* were "not in custody or otherwise deprived of [their] freedom of action in any significant way and therefore the state had no burden to show a knowing, intelligent, and voluntary waiver of the juveniles' right to counsel or

privilege against self-incrimination." 284 N.W.2d at 877. Since the appellant, here, was interrogated while in police custody, the State had the burden to establish that the appellant had made a knowing, intelligent, and voluntary waiver of his right to counsel, and that appellant realized the possibility that any evidence that he gave would be used against him in an adult prosecution for homicide.

1. Death or life imprisonment for Class A felony, SDCL 22–6–1(1); life imprisonment for Class B felony, SDCL 22–6–1(2).

26–7 *requires* the jury to find the degree of crime of which a defendant is guilty.

In *State v. Painter,* 70 S.D. 277, 17 N.W.2d 12 (1945), the defendant was charged with manslaughter in the first-degree but convicted of manslaughter in the second-degree. On appeal defendant urged that the trial court erred in giving a second-degree manslaughter instruction. We again emphatically held, citing *Hubbard* and *Stumbaugh,* that the trial court had a *duty* to instruct on second-degree manslaughter and it would have been reversible error not to do so.

These principles have been consistently reaffirmed in still later cases. In *State v. Violett,* 79 S.D. 292, 111 N.W.2d 598 (1961), the defendant was charged with murder and convicted of first-degree manslaughter. We said that:

> An Information alleging murder embraces all the elements of the lesser crimes of manslaughter defined by statute. A jury may find defendant guilty of any offense the commission of which is necessarily involved in that with which he is charged. SDC 1960 Supp. 34.3669. It follows that *if,* as we have concluded, *the evidence adduced was sufficient to have sustained a verdict of murder, it was sufficient to sustain the verdict of manslaughter.*

*Id.* at 608 (emphasis added). In *State v. Zobel,* 81 S.D. 260, 134 N.W.2d 101 (1965), *cert. den.* 382 U.S. 833, 86 S.Ct. 74, 15 L.Ed.2d 76 (1965), defendant was charged with murder and convicted of second-degree manslaughter. In *Zobel* the issue was again raised whether a verdict of second-degree manslaughter could be returned on a charge of murder. *Zobel* affirmed the conviction, citing *Hubbard, Stumbaugh* and *Painter. Hubbard's* holding that in homicide cases the jury's verdict could be "illogical" is explained in *Zobel:* if the evidence supports the offense charged, a conviction on a lower degree will not be set aside. In *State v. Vassar,* 279 N.W.2d 678 (S.D.1979), we cited SDCL 23–45–22 (SDCL 23A–26–7)

and *Hubbard, Stumbaugh, Painter, Violett* and *Zobel* for the rule that in homicide cases the trial court has a *duty* to instruct on degrees and lesser included offenses.[2] Clearly, as this court stated in *State v. Cook,* 319 N.W.2d 809, 813 (S.D.1982), ". . . the defense does not have the option of precluding the court from carrying out this duty in hopes of forcing an 'all or nothing' verdict."

*State v. Reddington* is not cited in any of the above cases and to my knowledge its holding on the instruction issue has, until now, reposed in the quiet sleep of the dead. If our choice is to unwrap this legal mummy or abide by nearly a century of living precedent, I opt to let the dead rest in peace.

I am hereby authorized to state that Justice DUNN joins in this concurrence in part and dissents in part.

WOLLMAN, Justice (concurring in part, dissenting in part).

I cannot concur in that portion of the majority opinion which holds that upon retrial appellant's statements must be suppressed because he was not advised that those statements could be used against him in the event that he should be tried as an adult.

I do not read the principal cases relied upon by the majority opinion as requiring the per se rule that the majority opinion adopts. In *State v. Gullings,* 244 Or. 173, 416 P.2d 311 (1966), the Supreme Court of Oregon was careful to point out that:

> The *parens patriae* relationship does not exist between police and child but between court and child. Police are in the business of solving transgressions against the welfare of society and the apprehension of those who are responsible therefor. They are not engaged in the rehabilitation of the child and the treatment of his emotional and family problems where the free exchange of information and a close relationship is so important. The

---

2. This rule is seemingly peculiar to felony homicide and should not be confused with the

lesser included tests applied to other criminal offenses. *Stumbaugh.*

use of information secured by police will not, in our opinion, tend to make more difficult the establishment of a close relationship between juvenile workers and the child.

244 Or. at 179, 416 P.2d at 314.

In following the *Gullings* decision, the Supreme Court of Minnesota stated:

We agree with the rule expressed by the Oregon court in *State v. Gullings,* 244 Or. 173, 416 P.2d 311 (1966). A confession by a juvenile is admissible if he has been apprised of his constitutional rights and voluntarily and intelligently waives those rights in making a statement. However, we recognize that the nature of the juvenile system may work to encourage a confession by a juvenile which might otherwise be withheld. While all of the facts and circumstances should be examined in determining whether a juvenile has intelligently waived those rights, it is important that the juvenile is questioned in an adversary setting and not in the confidential atmosphere of the juvenile court process; otherwise he may not realize that criminal responsibility might result. Awareness of potential criminal responsibility may often be imputed to a juvenile when the police are conducting the interrogation. Of course, the safest method the interrogating authority can pursue is to specifically advise a juvenile that criminal prosecution as an adult could result whenever such prosecution is possible.

*State v. Loyd,* 297 Minn. 442, 449–450, 212 N.W.2d 671, 677 (1973).

Indeed, as the Minnesota Court stated, the "safest method" might well be for the interrogating officers to specifically advise a juvenile of the possibility of prosecution as an adult whenever such prosecution is possible. Such a mandatory rule, however, carries with it its own inherent difficulties. Strictly speaking, prosecution of a juvenile as an adult is theoretically possible in any case, following the transfer hearing mandated by SDCL 26–11–4. As a practical matter, of course, only those cases that meet the criteria set forth in that statute

should be transferred to adult court, but the likelihood of such transfer becomes a matter of probability rather than possibility. In this regard, although as stated in the majority opinion the officers and the state's attorney had decided early on to request that appellant be tried as an adult, that decision was a matter for the circuit court and not for the prosecuting authorities. Granted that that decisional process would be triggered in the first instance by a request from the state's attorney's office that appellant be proceeded against as an adult, the ultimate responsibility for making that decision was for the circuit court, and for the circuit court alone.

It is interesting to note the conclusion reached by the Supreme Court of Minnesota in the *Loyd* case:

The defendant in this case had an extensive juvenile delinquency record, was on parole from the state school at Red Wing, and was under the supervision of a probation officer. Although Officer Brown did not specifically inform defendant of possible adult prosecution, he was not attached to the juvenile court and defendant knew he was a policeman. . . .

.        .        .        .        .

After considering all the evidence, we conclude that the record amply supports the trial court's finding that the inculpatory statements were not elicited in a context in which the defendant could reasonably believe that a protective and confidential relationship existed between him and the police.

*State v. Loyd,* 297 Minn. at 450–451, 212 N.W.2d at 677.

Likewise, the Supreme Court of Wisconsin reached a similar result, applying the *Loyd* rationale:

There is no question but that defendant's confession in the instant case is admissible in adult criminal proceedings. He was placed in custody by regular policemen, questioned at the detective bureau, and warned that his statements could be used against him "in a court of law." No evidence indicates defendant confessed expecting that his statements

could only be used in juvenile proceedings.

*Theriault v. State,* 66 Wis.2d 33, 52, 223 N.W.2d 850, 859 (1974).

One of the findings entered by the circuit court following the suppression hearing in the instant case was that "the defendant did not believe he was protected by the juvenile justice system." That finding is amply supported by the uncontroverted evidence that resulted in the following findings:

### I.

That on November 13, 1980, and prior to the defendant being detained on the charges herein, the defendant was an escapee from the State Training School in Plankinton, South Dakota.

### II.

That the defendant had an extensive juvenile history prior to the charges being brought herein, with considerable contact with the Court system during which he had been advised of his constitutional rights several times by Circuit Court Judges as well as by law enforcement officers and court services workers.

### III.

That the defendant had served three separate terms of detainment at the South Dakota State Training School, escaping from the third such term.

Likewise supported by the evidence presented at the suppression hearing, which included the testimony of a number of teachers and counselors who had worked closely with appellant during his several terms of detainment at the State Training School, is the trial court's finding that "the defendant's age, mental ability and educational level are adequate such that he understood what was said to him, could comprehend the rights explained to him, and was aware of the proceedings in which he was involved."

While it is unfortunate that there was a delay in the detention hearing, that delay resulted from the good faith, diligent efforts, ultimately unavailing, of the law enforcement officers to attempt to locate appellant's relatives at the locations in Rapid City that he described to the officers. (Appellant's mother was living somewhere in Minnesota, and his father had been killed in Viet Nam.) Had the officers not taken the time to conduct this search, they could have proceeded with the interrogation shortly after 8:00 a.m. on November 14. Unless we are to hold that law enforcement officers have absolutely no right to interrogate a juvenile before producing him at a detention hearing, a proposition that I do not understand the majority opinion to espouse, I believe that we must hold, however reluctantly, that in view of the totality of the circumstances the delay in taking appellant before the circuit court does not require suppression of appellant's statements. Although I agree with the majority opinion's rejection of the State's argument that the State may hold a juvenile for interrogation for up to forty-eight hours without a hearing, to say this, however, is not to say that the police may never interrogate a juvenile before bringing him or her before a circuit court judge under the provisions of SDCL 26-8-23.1.

I would affirm the order denying appellant's motion to suppress.