356 N.W.2d 916 (1984)
STATE of South Dakota, Plaintiff and Appellee,
v.
Dennis L. JANIS, Defendant and Appellant.
No. 14070.
Supreme Court of South Dakota.
Considered on Briefs November 29, 1983.
Decided October 24, 1984.
*917 Jon R. Erickson, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Thomas Amodio, Legal Intern, Pierre, on brief.
Michael Strain, White River, for defendant and appellant.
FOSHEIM, Chief Justice (on reassignment).
This case reappears following our remand for the entry of findings of fact and conclusions of law regarding defendant's motion to suppress evidence. The factual background was set forth in our opinion issued in the first appeal. See State v. Janis, 321 N.W.2d 527 (S.D.1982). We supplement the facts as necessary to address the issues now presented.
Upon remand, the trial court conducted a suppression hearing. Defense counsel called Sheriff Brandis and Mildred Janis, defendant's mother, as witnesses. The parties stipulated that the trial testimony of the victim and one of her daughters, together with that of Dr. Page, Father William Stolzman, and Sister Eleanor Kimball could be considered as suppression evidence. Defendant did not testify either at the trial or at the suppression hearing.
Following this hearing, the trial court found that defendant's statements were knowingly and voluntarily given and that the pretrial photo identification procedure employed by the sheriff had not resulted in the substantial likelihood of misidentification by the victim. The trial court accordingly denied the motion to suppress. Defendant appeals this ruling and contends the court erred in permitting the state to elicit testimony regarding his statements made to the examining psychiatrist. We affirm.

VOLUNTARINESS OF STATEMENTS
The rape occurred shortly before midnight on Saturday, August 9, 1980. By Monday, August 11, defendant was a suspect. On that day, Mellette County Sheriff Cecil Brandis, Jr., took the defendant from his residence to the sheriff's office to take photographs.
On August 12, Sheriff Brandis returned to defendant's residence and asked defendant to accompany him to the sheriff's office to answer questions about the break-in. *918 They arrived at the sheriff's office at approximately 2:00 p.m. Sheriff Brandis read defendant his Miranda rights. The following communication then occurred:
Sheriff: Do you know [the victim]
Dennis: No
Sheriff: Do you know were [sic] [the victim] lives.
Dennis: No
Sheriff: I then told Dennis that I would like to help him if I could, but that if he lied to me I wouldn't be able to.
Sheriff: I then asked Dennis again if he knew [the victim]
Dennis: Yes
Sheriff: Were you at her house Sat nite
Dennis: Yes
Sheriff: Were you in her house.
Dennis: Yes
Sheriff: I then asked Dennis if he would write down what he remembered about that time around the [victim's] residence
Defendant wrote the following statement at 2:20 p.m.:
I was drunk that night and I don't rember [sic] but I went throw [sic] some ladys [sic] window and had sex with and left.
Sheriff Brandis and defendant then left the sheriff's office to find defendant's mother. The sheriff, with defendant and his mother, returned to the sheriff's office. At 2:45 p.m., with his mother present, the defendant wrote and signed this confession:
I was drunk that night and I don't rember [sic] to [sic] much, but I went through some ladys [sic] window and had sex with her and fled.
The defendant's mother signed this statement as a witness. The second interview lasted between five and ten minutes.
The defendant was seventeen years old when he was charged with this offense in August of 1980. At defense counsel's request, the trial court committed defendant to the Human Services Center in Yankton to determine if he was competent to stand trial. Dr. Merle C. Page, a child psychiatrist who treated defendant from his court-ordered commitment in August of 1980 until December of 1980, testified that defendant has a whole scale I.Q. of 81, which is in the low normal range of intelligence. Dr. Page testified that defendant tends to be intimidated by, and tries to please authority, and that he is a meek person susceptible to suggestion. The evidence shows he had successfully completed a written South Dakota driver's license test on his first attempt. The trial court determined that defendant had "willed to confess" and that his choice was "essentially free and unconstrained." The trial court concluded that Sheriff Brandis adequately advised defendant of his constitutional rights against self-incrimination as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and that he voluntarily waived these rights.
The burden is upon the State to prove beyond a reasonable doubt that a confession or incriminating statement was freely and voluntarily made by the defendant before the same may be introduced into evidence. State v. Thundershield, 83 S.D. 414, 160 N.W.2d 408 (1968).
In making the determination whether a statement was voluntarily made, the trial court must review the totality of the circumstances surrounding the interrogation. See, e.g., State v. Caffrey, 332 N.W.2d 269 (S.D.1983); State v. Cowell, 288 N.W.2d 322 (S.D.1980). A statement is voluntary if it is the product of a defendant's free and rational choice. Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968).
The determination of the voluntariness of a confession is to be made without regard to the truthfulness of the confession. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Rogers v. Richmond, 365 U.S. 534, 81 S.ct. 735, 5 L.Ed.2d 760 (1961); State v. Thundershield, supra; State v. Volk, 331 N.W.2d 67 (S.D.1983).
*919 A finding by the trial court that a confession or incriminating statement was beyond a reasonable doubt voluntarily made is binding upon this court unless we conclude from our review of the record that the finding is clearly erroneous. See, e.g., State v. Hall, 353 N.W.2d 37 (S.D.1984); State v. Caffrey, supra; State v. Cowell, supra. In reviewing a trial court's finding on voluntariness we consider the evidence in the light most favorable to the finding. State v. Kiehn, 86 S.D. 549, 199 N.W.2d 594 (1972).
In applying these principles of law we must be mindful that defendant was a juvenile at the time the incriminating statements were made. In this vein, the United States Supreme Court has spoken:
[t]he totality approach permitsindeed, it mandatesinquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.
Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979). See also State v. Caffrey, supra.
However, the issue here remains not whether we agree or disagree with the trial court's finding but whether that finding is clearly erroneous. State v. Hall, supra; State v. Caffrey, supra. The trial court concluded that Sheriff Brandis did not make any direct or implied promises of leniency nor exert any improper influences over defendant. This is not a case where the juvenile was interrogated for several hours late at night, see State v. Lohnes,[1] 324 N.W.2d 409 (S.D.1982), or where the police intentionally delayed contacting the juvenile's parent or guardian, Id., or where, in addition to these factors, the police misled the juvenile and employed the threat of a lie detector test, see State v. Caffrey, supra. Here, Sheriff Brandis sought the presence of the defendant's mother before the confession used in evidence was written and signed. About the only further safeguard the Sheriff could have exercised would be to refuse to allow the defendant to confess. While the law properly insulates a juvenile of low intelligence with greater safeguards, it does not forbid him to voluntarily confess to a crime. The trial court found the confession was voluntary. We cannot conclude that finding was clearly erroneous.

PHOTOGRAPHIC IDENTIFICATION PROCEDURE
Defendant next contends the identification procedure employed was so impermissibly suggestive that it produced a substantial likelihood of irreparable misidentification, thus denying defendant due process of law.
The victim, age seventy-six, had undergone surgery to correct glaucoma two years earlier. She was required to put drops in her eyes twice a day and preceding the attack, she had treated her eyes, and she was about to retire. A young male entered her bedroom, pushed her backwards onto the bed and started beating her on the side of the head with his hands. The attacker then pulled off the victim's underclothes and raped her. The attacker then complied with the victim's request for a glass of water, exchanged some words with the victim and departed.
Throughout the assault, the lights were on in the bedroom. The victim was wearing her glasses and could make out the attacker's features. In her words, "It branded in my mind...." The attacker's face was inches away from her during the assault.
*920 Shortly after the attack, the victim described her assailant to one of her daughters and to law enforcement officers as a young Indian male with a short haircut, dressed in white cut-offs or shorts and a white t-shirt. Defendant had been seen in this rural town by one of the investigating officers about 11:00 on the night of the attack dressed in white cut-offs and a t-shirt.
The victim was sedated and taken to a hospital in Valentine, Nebraska, where she remained for four days. On Monday evening, August 11, Sheriff Brandis went to the victim's hospital room where he showed her two pictures that he had taken of defendant earlier that day, along with one picture each of two other young Indian males having hair styles and facial features similar to defendant's. Sheriff Brandis did not suggest that any particular photograph was of defendant or of any other suspect. Although the victim was unable to make a positive identification of her assailant from the photographs, she did indicate that the hair on the individual in one of the pictures was similar to that of the person who had assaulted her. The picture so identified was one of those depicting defendant.
Some two or three days after her release from the hospital, the victim positively identified defendant from his picture in a high school yearbook. At trial she again identified defendant as the person who had attacked her.
In Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Court discussed the danger of misidentification that may result from an improper use by the police of photographs to aid witnesses in identifying a suspect.
It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the person pictured committed the crime.
390 U.S. at 383, 88 S.Ct. at 971, 19 L.Ed.2d at 1253 (footnotes omitted).
The Simmons Court was unwilling to bar the use of pretrial photograph identification procedures, holding that
[E]ach case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.
Simmons, supra, 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.
The Court then went on to conclude that the procedure utilized in the case left little chance of misidentification of the defendant, noting that the crime had taken place in a well-lighted area, that the witnesses had been able to see the defendant for periods ranging up to five minutes, that the witnesses had been shown photographs of defendant and other persons only one day after the crime, and that the record did not indicate that law enforcement officers had in any way suggested which persons in the pictures were under suspicion. The photographs of the other two young Indian males, although darker in background color than those of defendant, portrayed individuals reasonably similar to defendant in terms of age, hair style, and facial features. Sheriff Brandis in no way suggested *921 that any one of the pictures was that of the person who had attacked the victim. The victim's opportunity to view her attacker was under better lighting than existed in State v. Reiman, 284 N.W.2d 860, 871-872 (S.D.1979), also a rape case. There we said:
In Neil v. Biggers, [409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) ], the Court noted:
The victim spent a considerable period of time with her assailant, up to half an hour. She was with him under adequate artificial light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, face him directly and intimately. She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes.
409 U.S. at 200, 93 S.Ct. at 382, 34 L.Ed.2d at 412.
In view of the circumstances, we can assume the witness' degree of attention was very high. State v. Keeling, [89 S.D. 436, 233 N.W.2d 586 (1975) ].
Upon applying that analysis to these facts, we cannot disagree with the trial court's determination that the pretrial photograph identification procedure employed by Sheriff Brandis was not impermissibly suggestive.

IMPROPER CROSS-EXAMINATION OF DR. PAGE
Defendant finally contends the State improperly cross-examined Dr. Page. Defendant told the doctor that he entered a house and had sex with a woman.
Dr. Page, who was called as a defense witness at the second trial, was asked on direct examination about defendant's propensity for violent acts. Specifically, defense counsel asked Dr. Page whether he would be afraid to have defendant in the same home with Dr. Page's mother, grandmother, or wife; to which Dr. Page replied in the negative. In response to defense counsel's question whether defendant had showed any tendency that he would be a rapist, Dr. Page testified that, "I haven't seen any sexual problems or violent problems with Dennis." Defense counsel then summarized the facts surrounding the alleged offensethat the victim was a seventy-six year old woman who was wearing a cast on her leg and was struck on her head by her attacker and then thrown to the bed and rapedand then asked, "Doctor, would it be a fair statement to say that that particular act would be really foreign to Dennis?" Dr. Page replied, "That would be fair to say."
Over defense counsel's objection, the trial court permitted the State to ask Dr. Page whether defendant had said anything regarding his involvement in the alleged rape. Dr. Page then replied, "I remember Dennis making the statement that made conflicting statements. [sic] He made a statement that he couldn't remember, that he was drunk, he made a statement that he had entered a house, had sex with a woman." Dr. Page also stated that defendant had told him that he had entered the house through the front door and pushed in the screen.
Defendant contends his right against self-incrimination and his right to the assistance of counsel guaranteed to him by the fifth, sixth, and fourteenth amendments to the United States Constitution were violated by the admission of the above-quoted answers given by Dr. Page during cross-examination. In support of this contention, defendant cites Estelle v. Smith, 451 U.S. 454, 456, 101 S.Ct. 1866, 1869, 68 L.Ed.2d 359 (1981). We find that decision to be inapposite. In that case the State offered a psychiatrist's testimony regarding the defendant's propensity towards future dangerousness. Here, in stark contrast, it was defense counsel who called the psychiatrist as a witness and then sought his opinion on defendant's lack of propensity towards violence and of the unlikelihood that defendant would have committed the offense charged. In effect, defense counsel attempted to voice defendant's denial of guilt through the mouth of the psychiatrist. Defendant could not advocate *922 this position through a surrogate, the psychiatrist, and then expect it to be exempt from cross-examination. By offering this testimony, defendant waived whatever privilege against self-incrimination and right to counsel he may otherwise have had. Having waived those rights, he cannot now complain of unconstitutional denial.
The judgment of conviction is affirmed.
MORGAN and HENDERSON, JJ., concur.
DUNN, Retired Justice, concurs.
WOLLMAN, J., concurs in part and dissents in part.
WUEST, Circuit Judge, acting as Supreme Court Justice, not participating.
WOLLMAN, Justice (concurring in part, dissenting in part).
I would hold that the trial court erred in ruling that defendant's statements had been voluntarily given.
As the majority opinion points out, defendant, who is an Indian, has a whole scale I.Q. of 81. Dr. Page testified that this is in the low normal or borderline defective range of intelligence. In addition to Dr. Page's testimony regarding defendant's submissiveness towards authority figures, Sister Eleanor Kimball testified that defendant had been a student of hers for two years, that defendant had had a difficult time in school, earning grades of Dand F in her English courses, that defendant is a meek person, and that he tries to give the appearance of pleasing authority.
Likewise, Father William Stolzman, a Catholic priest who had grown very close to defendant and had had hundreds of conversations with him prior to August of 1980, testified that defendant is below average intellectually, that his comprehension is quite slow, that defendant would do anything asked of him to get out of tense situations, and that he basically tries to please people. Father Stolzman has been the parish priest for both the white Catholic Church and the Indian Catholic Church in White River for a number of years. He has worked in the area of Indian adolescent psychology and has had much experience in the area of Indian culture, serving for the past seven years as the chairman of the Medicine Men and Pastors, a local dialogue group. He testified that in common with many young Indian people, defendant, who has no acknowledged father, lacked security, with the result that in Father Stolzman's opinion defendant would respond, "All right, I will do whatever you want me to do," in response to a statement from a law enforcement officer to the effect that "I am not going to help you unless you do what I tell you to do."
Among the trial court's findings of fact were the following:
XIII
Father Stolzman, based upon his experience with Defendant, offered the opinion that when finally confronted about a given activity, Defendant would truthfully admit his involvement.
XXVIII
Defendant related to Dr. Page, the defense expert, that he didn't remember much, that he was drunk and that he had entered the house through the front door by pushing in a screen window, and had sex with a woman.
The burden is upon the state to prove beyond a reasonable doubt that a confession or incriminating statement was freely and voluntarily made by the defendant before the same may be introduced into evidence. State v. Thundershield, 83 S.D. 414, 160 N.W.2d 408 (1968).
A finding by the trial court that a confession or incriminating statement was beyond a reasonable doubt voluntarily made is binding upon this court unless we conclude from our review of the record that the finding is clearly erroneous. See, e.g., State v. Hall, 353 N.W.2d 37 (S.D.1984); State v. Caffrey, 332 N.W.2d 269 (S.D.1983), State v. Cowell, 288 N.W.2d 322 (S.D.1980). In reviewing a trial court's *923 finding on voluntariness we consider the evidence in the light most favorable to the finding. State v. Kiehn, 86 S.D. 549, 199 N.W.2d 594 (1972).
In making the determination whether a statement was voluntarily made, the trial court must review the totality of the circumstances surrounding the interrogation. See, e.g., State v. Caffrey, supra; State v. Cowell, supra.
The determination of the voluntariness of a confession is to be made without regard to the truthfulness of the confession. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); State v. Thunder-shield, supra; State v. Volk, 331 N.W.2d 67 (S.D.1983).
In applying the foregoing general principles of law and of appellate review, we must keep in mind the fact that defendant was a seventeen-year-old juvenile at the time the incriminating statements were secured from him. As the United States Supreme Court has written with respect to the determination whether a juvenile has voluntarily waived his constitutional rights,
The totality approach permitsindeed, it mandatesinquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.
Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979). See also State v. Caffrey, supra.
As we pointed out in Caffrey, the United States Supreme Court has stated that the youthfulness of an accused is a significant factor in determining the voluntariness of a confession. Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948).
Likewise, we have held that a juvenile's constitutional right against self-incrimination should be afforded additional protection. State v. Lohnes, 324 N.W.2d 409 (S.D.1982).
If counsel is not present when a confession is obtained from a juvenile, a court must take great care to assure that the confession was voluntary "in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair." Re Gault, 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527, 561 (1967).
Defendant was some seventeen years, five months old at the time he was interrogated, having been born on March 6, 1963. There is no indication in the record that he had ever been involved in any type of juvenile court proceedings on prior occasions or that he had had any extensive contacts with law enforcement officers, probation officers, or court officials. Cf. Fare v. Michael C., supra.
Even more significant than defendant's age and lack of prior contact with law enforcement officials and court proceedings are his low intelligence, his slow comprehension, and his complaisant personality.
Concerning defendant's low intelligence, there can be no argument. Even Sheriff Brandis acknowledged that defendant was "a little dull." At best, defendant is in the low normal range of intelligence and may even be in the borderline defective range. That defendant is slow to comprehend is abundantly established by the testimony of Dr. Page, Father Stolzman, and Sister Kimball.
Compounding the effect of defendant's deficit in cognitive ability is his apparent great inner need to satisfy and please those who stand in a position of authority in relation to him. This need may be traced to defendant's racial, cultural, and familial background, as testified to by Father Stolzman. Whatever its source and cause, however, defendant's complaisance cannot be overlooked in determining whether his statements were voluntarily made.
*924 When considered in the light of the foregoing factors that bear upon defendant's capacity to knowingly, intelligently, and voluntarily waive his constitutional right against self-incrimination and his right to counsel and to make a free, rational choice to confess, Sheriff Brandis' statement that "I then told Dennis that I would like to help him if I could, but that if he lied to me I wouldn't be able to," takes on a significance that it would not have had had defendant been an older, more experienced, more intelligent, more self-reliant individual. Although the trial court's conclusion that Sheriff Brandis had not made any direct or implied promises of leniency and had not exerted any improper influence over defendant may be technically correct in terms of a literal reading of Sheriff Brandis' statement to defendant, I do not believe that it accurately reflects what that statement most probably meant to a person of defendant's age, experience, intelligence, and personality. Rather, I believe that Dr. Page's testimony that the statement constituted an implied threat and a promise to help by Sheriff Brandis is a more logical explanation, and I would hold that the statement had the effect of rendering defendant's answers involuntary within the constitutional meaning of that term. A statement is voluntary if it is the product of a defendant's free and rational choice. Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968). When measured against this standard, I cannot say beyond a reasonable doubt that defendant's statements were voluntarily made. Accordingly, I would hold that the admission of the statements in evidence violated defendant's constitutional right against self-incrimination guaranteed to him by art. VI, § 9 of the South Dakota Constitution.
In reaching this conclusion, which partakes of the nature of a constitutional value judgment, I acknowledge that admittedly this is a close case. I attribute no malevolent motives to Sheriff Brandis. I assume that he conducted the interrogation in a good faith belief that he had fully complied with all constitutional requirements. Had this court opted in State v. Thundershield, supra, to adopt the less stringent preponderance-of-the-evidence test later sanctioned as a matter of federal constitutional law by the United States Supreme Court in Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), I might very well have joined in the majority opinion. Also, had the trial court had the opportunity to judge defendant's comprehension and intelligence on the basis of defendant's demeanor on the witness stand, the finding of voluntariness would have carried greater weight. SDCL 15-6-52(a). As it is, however, especially in view of the fact that the trial court found it necessary to include as a basis for its finding of voluntariness the irrelevant and inadmissible consideration of the post-interrogation evidence of the truthfulness of defendant's statements, I cannot agree that beyond a reasonable doubt the statements were voluntarily given.
I concur in the majority opinion's treatment of the other issues raised in this appeal.
NOTES
[1] This case was appealed before the Lohnes decision was published. In Lohnes the authorities had decided to prosecute the juvenile as an adult prior to questioning. Lohnes, 394 N.W.2d at 414. In this case it appears the Sheriff was not prepared to charge Janis with a crime, either as a juvenile or as an adult at the first interview. This issue was not raised on the first appeal and was not within our limited remand. We accordingly decline to apply the Lohnes rule requiring that a juvenile be advised he may be tried as an adult.